NorCal Outdoor Media. There we go. Very good. Now we see you both now and you may proceed with your argument. Good morning. My name is Michael Stein. I represent NorCal Outdoor Media. In this appeal, I believe that NorCal has established that it does have Article 3 standing. The sign at issue. NorCal installed the dual-face digital billboard sign, Tracy, California, has alleged that it was constructed in conformity with applicable building standards and engineering requirements, and it complies with size and height requirements. NorCal intends to publish messages on the sign pertaining to goods and services, philanthropical issues and organizations, charitable goals, and a host of issues of political and public importance. NorCal did not apply for a permit from Caltrans because it believed doing so would have been futile because the messages it wants to place on its sign are deemed illegal under the Outdoor Advertising Act. Well, does your client, do you ever, in your complaint, provide any specific examples of statements or other content your client wants to place on its billboards that it thinks would violate the OAA? Yes, Your Honor. In the original complaint, it was filed, I believe, before the election, and they gave an example of something that it would place on this sign, Trump in 2020, for example, which would be prohibited. When the First Amendment claim was filed, the election was passed. So what we did was we showed the categories that we intended to violate. So, for example, 5402 dealing with obscenity, indecency, immorality, and other sections of the code which define what you can't say. For example, you can have a sign that says that you're selling real property here, but you can't have the same sign that says vote Biden. So the categories were addressed. But I think under, when we look at the Susan B. Anthony List case, they were under a similar situation. The Sixth Circuit suggested that because, you know, the election was already over, and they removed the case before the commission, and they were now going forward with the litigation. They said, well, you don't really have a concrete claim of what you're going to do in the future. It's already happened. But the Supreme Court reversed that decision and held that what they did say, what they were going to say in the past, and they said they're going to say similar things in the future, and that was enough to hold standings. And that's what I think happened here. I think the district court there was able to evaluate that North Carolina was asserting a First Amendment pre-enforcement injury, and inappropriately applied Get Outdoors Too. Well, can you point to the specific sections of the OAA that you allege give Caltrans unfettered discretion to deny permits based on the contents of the proposed sign? Can you tell me? Yes, Judge Kellyanne. I want to make sure I didn't hear the first part of your question. Did you say, did we point to sections before you asked me to now? What specific sections? Can you point me to the specific sections of the OAA that you allege give Caltrans unfettered discretion to deny permits based on content? Okay, so we start with Section 5203, which actually defines an outdoor advertising structure. And what it does is it states what things aren't even deemed an advertising structure just by that definition, even though they otherwise would be under the OAA. For example, the government can have official notices issued by public officers, but there's no definition of those notices. So a police officer could, or maybe a sheriff or a county could say on the sign, we believe that the Governor Newsom's orders are inappropriate on COVID masking requirements. We're not going to enforce them here. It would be deemed a message they'd allow, but the same, but NorCal couldn't say follow Governor Newsom's instructions on wearing masks. It's important for public health. That would be prohibited on the same sign in the same location. But how do you know that they wouldn't accept it unless you actually apply for a permit to put the language on the sign? Because they are flatly prohibited. They're flatly prohibited by the statute itself. So does your client, I mean, I'm looking now at 5402. Does your client intend to put obscene, indecent, and immoral material on the signs? Indecent and immoral, not what would be deemed constitutionally obscene, although that seems pretty vague in today's community standards as well. No, I mean, my question is, does your client intend to put obscene, indecent, or immoral material on the signs? Yes. And what exactly do you want to put on the signs that you think are obscene, indecent, and immoral? Okay, Your Honor. So, for example, And what's in the record on that? Go ahead. I'm sorry, what was that last point you said, Your Honor? And if you can point me to something in the record where you actually have proposed something, then please do. Your Honor, the record did not propose the specific statements because this is a dual-sided digital billboard. Its messages can flip every eight seconds of every hour of every day of every year. So we pointed to the categories. However, if it was necessary to say the exact messages, which would seem to be a departure for the Susan B. Anthony list, an amendment to the complaint would certainly allow that. It would just be making it more of a Rule 9 pleading and not a Rule 8 pleading. And we can lay out all kinds of messages that would happen over the future that can be anticipated. We dealt with categories. But, for example, one example was shown in the first complaint. We said Trump in 2020. That would not be permitted on this side. But buy the land on this side would or buy a Hershey bar sold on this property would be allowed to. So if the intent in the future, which is coming up and will be there, will be either vote for Biden in 2024 or make sure you don't vote for Trump in 2024 with Trump depicted as Mussolini with a swastika behind him might be deemed indecent. But you don't know. You don't know until you ask. Well, you don't know if you ask, but that has a chilling effect if you want to post it. And I don't think I under under Susie B. Anthony, if we have a credible threat of enforcement, we don't have to ask first. And that's the same in reality. If I understand your position is that the essentially the credible threat is simply the statute itself. Well, as an officer of court, I would state to you that we can amend the complaint and should be allowed to amend the complaint to to assert that the principle. One of the principles of NorCal is aware of a threat where related companies have had enforcement action taken against them in a similar situation. And also that we could amend in the complaint that the discussion happened during a mandatory conference. After the pleadings were already filed in and during the time that after the motion dismiss was filed in which you're talking about a mediation conference, you probably shouldn't. No, no, it wasn't about talking about mediation. It was simply asking independently, would you intend to enforce this against us or this the trials? Excuse me, the trial attorney, not me. Mr. Gilmore asked if they intend to apply against them. The state would not admit or deny whether they're doing so. Well, is it your position that because the OAA gives Caltrans unbridled discretion to issue permits, your client did not need to articulate concrete detailed plan to violate the statute to establish standing? Is that what is that your position? Well, I'm trying to kind of distill what I think your position is. Yeah, I don't what I'm saying is I think it's sufficient to show the categories that you're going to intend to violate. Similar to what happened with with yay in the Susan B. Anthony List case, which they did not have concrete statements what they were going to say in the future because the statement that they made was about one particular politician who had lost his election. So there was similar simply say they were going to say things similar. I think we have more concreteness than what they had in the in the Susan B. Anthony List case. Here we're stating these sections and those sections state what it is you can and can't say what you can't say unless you're a privileged speaker. We're saying we're going to say things that violate that. So we are going to say things that you that we believe you will find indecent and moral. These messages flip every eight seconds, your honor. So the idea that you go and ask, can I say this? Can I say this? Can I say this today? When they're flipping every eight seconds doesn't does not seem necessary under rule eight. But if it is necessary, that's going to easily be cured. So the district court erred in suggesting that it couldn't be cured. And the district court's order focused only on the injury. In fact, instead, there's nothing that could cure it. But clearly, if it's necessary to state concrete messages as opposed to the categories, then that can be cured quite easily. You state we intend to say this over the next year, for example. And say the messages that they would intend to place. It's just going to make for a very long complaint. And I think it's unnecessary. It certainly puts the state on notice what types of speech we're looking at. And we put the state on notice of the statutory elements. It seems like you don't want to file a permit ever. That's what it seems like. Well, it may seem that way. But the law, I think many of the cases have shown. And in the Rialt case is another example of that. It would be futile to file a permit. Because what we're asking you to do is flatly prohibited by the statute. And Susan B. Anthony addressed that very issue. Well, your position seems to be that the state has no power to regulate at all. No. It just shouldn't. No, it can't. Of course it can regulate. But when it has unconstitutional provisions that chill speech. And we should be able to challenge those and be able to speak. Because the threat is clear. It is true. There is a statute. There hasn't fallen into despotism. In other words, there's no evidence of disuse. And throughout these proceedings, the state has never come forward and said, we're never going to. We're never applying these statutes. Statutory scheme. If you want to put your Trump billboard, your Trump message up, go ahead. It's okay. Even though we say the statute clearly says you can't. And like I said, if it were required. Susan, if you felt that there isn't a sufficient fear here, that you have to state what your concern is. And we could amend the pleading to do that. It's possible to do it. It's not futile. I just don't think it's necessary. Yeah. You're under three minutes. Do you want to reserve? Yes, I'll reserve three. Thank you. Good morning, your honors. And welcome Judge Seiler, Daniel O'Shea, on behalf of the director of the California Department of Transportation. And may it please the court. I think your honors sort of questions have cut right to the chase, which is that there is no speech specifically pled anywhere in the complaint. And as we pointed out in our briefing, discussed in the district court on the motion for judgment on the pleadings and the motion to dismiss, the case started off with the Trump 2020 allegation that Mr. Stein just mentioned. The court granted our motion for judgment on the pleadings. First amending complaint didn't contain any speech. And, in fact, they deleted that portion, which, irrespective of that, the Trump 2020, interestingly, statement doesn't fall within the Outdoor Advertising Act. It's not a temporary political sign. Mr. Stein's structure, NorCal's structure, is a permanent sign. And so that's not a problem under 5275 of the Businesses and Professions Code. Mr. O'Shea, what would be your response to it? It seems that NorCal's argument is that it doesn't need to attempt to obtain a permit prior to challenging the statute because the OAA gives Caltrans unbridled discretion over whether to issue a permit. Yes, Your Honor. And I think my response would be there's a – well, if we can start off with the Susan – strike that. The director doesn't have any discretion whether or not to issue a permit or not. If the requirements of the Outdoor Advertising Act are met, then the director or Caltrans must issue the permit. And there was a contention that there is a paradox contained in the Outdoor Advertising Act on when exactly the director or Caltrans needs to issue the permit. And we did point out in the district court and again in our briefing that there is a 10-day requirement, and then there's also a safeguard to protect against the Caltrans not issuing a permit timely, and that's found in Title IV of the California Code of Regulations 24266, which states that Caltrans must timestamp an application when it comes in. They have 30 days to notify the party of any deficiencies and 60 days within which it must issue a ruling. So there's no timing paradox. There's no unbridled discretion. There's not really any discretion that the Caltrans must issue the permit where all the requirements under the Outdoor Advertising Act are met. So your opponent relies almost entirely on Susan B. Anthony. How do you distinguish that case? That's right, Your Honor. I'm sorry to interrupt during the question. Susan B. Anthony and also Real v. City of Long Beach, and I think those are both distinguishable. In Susan B. Anthony, there was some speech that the court could hang its hat on. To find Article III standing in there, there was a statement made during an election that, well, so there was a prohibition against saying, I forget what the actual ordinance said, but essentially something that is wrong or devious, I forget what the word is, during an election cycle. And the plaintiff said taxpayer-funded abortion is, the ACA is, the Affordable Care Act is taxpayer-funded abortion. There was a hearing with the Elections Commission, and I think there was a two-to-one ruling finding that that statement actually violated the law. So here we've got no statement. No statement. There has never been no communication with Caltrans over any statement. There's nothing outside the pleadings in this case about any statement. So I think that's why Susan B. Anthony is distinguishable. There was actual statements there that the court could consider Article III standing on. And then another case that my opponent relies on is Real v. City of Long Beach, similar situation there. The petitioner wanted to open a tattoo parlor. The city found that that violated its zoning ordinance. There was a letter from the lawyer on behalf of Ms. Real explaining the zoning ordinance and how it violates Ms. Real's expressive rights. The city responded to that letter explaining their position. And then Mr. Real went on to argue in the appeal that the city had threatened to enforce the zoning statute against any parlor that, any tattoo parlor that he opened. So I think that's distinguishable. Again, Your Honor, there's some actual communication between the licensing authority and the party seeking to avoid getting a permit. There's nothing like that here. Mr. Seidman mentioned in his briefs, and this was mentioned in the pleadings, that there were these quote-unquote catalyst letters, which NorCal ostensibly sent to the Attorney General, not to Caltrans. I've never seen the letters. They're not in the record. I don't know what they say. But in any event, Caltrans is required under Article III, Section 3.5 of the Constitution, to enforce its laws. I don't think there's ever been a threat by Caltrans. Certainly not by me. There was some discussion in a declaration in the trial court. I think it was attached to the record here by Mr. Seidman's predecessor saying that I would not stipulate not to enforce the act against NorCal. And as I mentioned in that phone call, it's constitutionally prohibited under Article III, Section 3.5 of the California Constitution. I welcome any other questions from the court. So as a matter of procedure, how does Caltrans determine whether the content of a proposed billboard is immoral? I did mean to address that, Your Honor, and that is something that we address in our answers. So that section was invalidated as unconstitutional in People v. Turner in our answer in our supplemental excerpts of the record. I want to say it's at paragraph 17 and 18, if I recall correctly, of our answer. So it's a non-issue, Your Honor, and it really just illustrates the point. If Mr. Stein's client sent us a letter saying they wanted to post something obscene, non-commercial obscene speech, or if they applied for a permit, or if there was any communication at all about that, it could have very easily been addressed because that section is. Let me ask you a broader question then. What is the process by which discretion is exercised? Just describe that for me. Your Honor, there's, you mean,  I'm sure, Your Honor, there's a series of forms that an applicant fills out stating, you know, where the sign is that they've complied with various building codes, that they've got approval from the local permitting or county or city, and there's some various things that you, various checkboxes, essentially, that you fill out on the forms, and then an inspector will go out and view the sign and determine if there's any violations, if anything needs to be changed, if anything's missing. Caltrans will issue a notice of deficiency if there's any problems, and if there's no problems, then the director issues a permit. How much specificity does the plaintiff have to put out to your organization in order to proceed here? Your Honor, it's been a while since I've looked at the actual applications. They're not in the record, but I think for purposes of Article 3 standing, I think they need to be certainly more specific than they have been. I think Mr. Stein, I don't want to misquote him, but said something along the lines of they don't have to be specific in what they intend to say, and I disagree with that. I think the district court disagreed with that when finding and granting the motion to dismiss the First Amendment complaint where there was no specific speech alleged. Does that answer your question, Judge Steiner? Well, I'm not sure. Does that mean that every time they put up a different ad for someone who's running for political office, they must come back to you and have that approved? Yes, Your Honor. The sign regulations actually don't have anything. They don't address content. They're size, lighting. There's a checkbox, I think, on whether or not the speech is off-premises, commercial coffee, which is what the Act regulates, but there's not a list where you have to say literally every single thing that you're going to say on the sign. It's more to determine if there's commercial off-premises speech. Any further questions? Thank you, counsel. Thank you, Your Honor. We'll hear rebuttal. I'm afraid you're muted. Can you hear me, Justice? Yes. The idea of this 10-day to grant or deny is somewhat misleading. Under 5338 of the Outdoor Advertising Act, the permit will be issued within 10 days after the department first determines the application is in full compliance with the chapter. So that is a sticking point. Somebody has to make a call, whether it is or isn't, and there's no time frame by which they have to make that call. So the 10 days, really, it's illusory because the triggering of the 10 days allows someone to say, I don't think you're there yet, and that could go on in perpetuity. I want to hear what you're going to publish in a year from now or two years from now if this goes up. Again, this is a little bit different than just a speech in a park or a one-time sign of the candidate. We're talking about messages that go up every eight seconds on two sides of a sign. It's clear that billboards are going to convey a multitude of messages constantly. Again, it could be every eight seconds. And so when you apply what happened to Susan B. Anthony List to this case, I think we satisfy that injury, in fact, more than what happened there. In that case, this lawsuit went forward after there was nothing being challenged anymore. The statement that the legislator had supported a bill on abortion was over. The election was over. He lost. He removed the action before the commission. So there was nothing chilling the speech. It was there. So the case got to go forward based on the plaintiffs suggesting, we're going to say something similar in the future. And this was true of Coase, too, when they joined the lawsuits. It was all about basing the following. You're fading out. I'm sorry. Judge Seiler has a question, I believe. Yes, Judge. Do you have a question? Oh, I'm sorry. I misunderstood. That's fine. Let me ask you one. You referred earlier to a communication between, I think, Mr. Gilmour and Caltrans. Yes. And that's the one where they said they couldn't comment? No. They stated that they couldn't say or they would or wouldn't take any action, but it's their responsibility to enforce the law under the Constitution. And I think Mr. O'Shea just made it crystal clear that they do have to. I don't have that in front of me. What I have in front of me is your brief where you say, Caltrans counsel replied that they could not comment on whether an investigation was underway regarding a possible enforcement action, nor could they predict with any accuracy if and when Caltrans might enforce the OAA. Is that right? That's correct. So how is that a threat of enforcement? Well, because the failure to tell you whether they will or will not has a chilling effect on speech. Because if they will, you're subject to prosecution. And under article nine, it's not just North Cal that can get prosecuted. It's their employees. So it could be the gentleman that just goes out there and tightens a bolt. So that has a terrible chilling effect on speech. You don't want to subject your employees and your principals to prosecution. So if someone's telling you they're not going, we're not going to tell you if we're going to do it or not, that has a chilling effect. I'm not sure I've had any experience with an agency where you say, can you tell me whether you're going to enforce this or not? And they say, well, can't tell you. I mean, that's pretty common response from a state agency. And so therefore this is why it's safe in first amendment grounds. It's such important to have chilled speech, say, okay, then you have standing to move forward because it's going to have a chilling effect and has had a chilling effect. Remember in this case, this is not unlike the tattoo artist in real, which he didn't even have a store shop open yet. Here there's a sign that is fully functional, ready to go. Speech is being chilled. They could speak scared. There's fear. Okay. And that creates the injury. Our questions have taken you over your time. And we thank you both of you for your arguments this morning. The case just argued to be submitted for decision. And we'll be in for the morning. Thank you.
judges: Siler, THOMAS, CALLAHAN